# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
MATTHEW F. FOGG,                                    )
)
      Plaintiff,                                     )
)
      v.                                             )     Civil Action No. 94-2814 (JAR)
)     **Before:  Restani,[*] Judge**
ALBERTO R. GONZALES,[**]                            )
Attorney General of the United States,              )
)
      Defendant.                                     )
_____      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Matthew Fogg's motion for equitable relief is before the court upon remand from

the court of appeals.  See Fogg v. Ashcroft, 254 F.3d 103 (D.C. Cir. 2001).  A jury found that

Fogg's employer, the United States Marshals Service ("USMS"), violated 42 U.S.C. § 2000e-16

by subjecting him to a racially hostile work environment, and by discriminating against him on

the basis of race in specific instances.  Jury Interrog. (Apr. 28, 1998) at ¶ ¶ 1–3.  The district

court (the "trial court") entered a judgment for money damages but granted only part of Fogg's

request for equitable relief on the ground that the USMS validly dismissed Fogg for

insubordination.  See Order (Feb.  25, 2000).  Pursuant to the remand instructions, this court

considers Fogg's claims for equitable relief in the light of the issue-preclusive effect of the jury's

---

[*]  The Honorable Jane A. Restani, Chief Judge, United States Court of International
Trade, sitting by designation.  The Honorable Thomas Penfield Jackson, United States District
Judge for the District of Columbia, presided at trial.

[**]  Alberto R. Gonzales is substituted for his predecessor, John D. Ashcroft, as Attorney
General, pursuant to Fed. R. Civ. P. 25(d)(1).

verdict.  For the reasons explained below, the court grants, in part, Fogg's requests for equitable

relief.[1]

## BACKGROUND

Fogg, an African-American male, was employed by the USMS as a deputy U.S. Marshal

in the Washington, D.C. metropolitan area from 1978 until his dismissal on September 30, 1995.

Currently, he collects workers' compensation but is no longer employed by the USMS.

In this action, Fogg claimed he was subjected to a racially hostile working environment

throughout his employment and also claimed to have suffered racially-motivated disparate

treatment and/or retaliation in several specific instances.  The instances of alleged discrimination

began in 1985, when Fogg received a harsh reprimand and was transferred, ostensibly as

punishment for having misused a government car.  In response, Fogg filed an administrative

Equal Employment Opportunity ("EEO") complaint, but it languished for years in the hands of

the USMS.

With his EEO complaint still pending in 1989, Fogg was assigned to a position on the

Metropolitan Area Task Force, a multi-agency unit tasked with tracking and apprehending

dangerous fugitives.  While on the task force, Fogg twice did not receive his annual performance

ratings.  He was passed over for promotion from the GS-12 to the GS-13 government salary level

in May 1990.  Once he obtained a promotion to the GS-13 level, he received no further

promotions.   Fogg was stripped of most of his task force supervisory responsibilities in January

---

[1] On January, 21, 2005, Fogg filed an updated memorandum of points and authorities in
support of his post-remand motion for equitable relief, which was filed on November 5, 2001.
Fogg's 2005 filing moots his motion for payment of judgment and a ruling on the equitable relief
issues or other relief.

1992.  By 1993, Fogg was out of the field and in a desk job.  While working in that capacity,

Fogg had several meetings with USMS personnel in connection with EEO issues, including his

1985 complaint.  His supervisor inquired about his EEO activities on March 4, 1993.  This

inquiry allegedly subjected Fogg to severe psychological stress, and thereafter he ceased working.

By October 1993, Fogg had exhausted all of his accumulated annual and sick leave and

was placed on administrative leave.  In December 1993, Fogg underwent a fitness-for-duty

examination under the orders of the USMS.  On November 14, 1994, the USMS ordered Fogg to

return to work at the U.S. Marshall's Office for the District of Columbia.  Fogg reported for duty

on November 23, 1994, but remained for only a few hours before he complained of sickness and

left.  The USMS then attempted to schedule a fitness-for-duty examination for Fogg in January

1995.  Fogg rescheduled the examination for a later date that same month, but he did not appear

for the rescheduled appointment.  Fogg claimed to have written a letter to the doctor explaining

that a court date prevented him from appearing at the rescheduled appointment, but the evidence

does not show that the doctor received the letter until several months after the appointment.

Claiming Fogg refused to report to the examination, the USMS dismissed him for

insubordination from his position, effective September 30, 1995.  Fogg appealed the dismissal to

the Merit Service Protection Board ("MSPB"), which found it to be valid.

Over the course of the month-long trial in April 1998, numerous witnesses "described a

[USMS] . . . that has labored in substantial racial turmoil for at least a decade, and in which racial

identities are keenly felt."  Mem. & Order (July 1, 1999) at 5.  African-American members of the

USMS perceived a pervasive attitude that "they are less highly regarded and more is expected of

them than their white peers."  Id.  Defendant attempted to show that Fogg had not personally

been subjected to a racially hostile working environment, and explained that the specific

allegations of discrimination and/or retaliation were attributable to Fogg's shortcomings as a law

officer and leader rather than his race.  Id. at 5.

At the conclusion of the trial, the trial court provided the jury with instructions and

interrogatories.  Jury Instruction 30 provided the jury with the analysis it had to follow in

determining liability, providing, in pertinent part, as follows:

> If you find that plaintiff has established a prima facie case of discrimination,
> defendant may then show that there were legitimate, nondiscriminatory reasons,
> i.e., reasons other than the plaintiff's race, for the defendant's actions.  If
> defendant has shown that there were reasons other than race for the challenged
> actions, you must find for defendant, unless plaintiff proves that these reasons
> were false and that the real reason for the challenged actions was plaintiff's race. .
> . . Plaintiff is not required to prove that his race was the sole reason, or even the
> primary reason for any of those actions.  Rather, plaintiff need only prove that
> consideration of his race played a part in those actions, even though other reasons
> may also have motivated those actions.  Plaintiff at all times bears the ultimate
> burden of persuading you that defendant intentionally discriminated against him.
> Consequently, in order for you to find for plaintiff, you must find from all of the
> evidence that plaintiff has proved by a preponderance of the evidence that
> defendant's motivation for taking the actions which plaintiff challenges was
> because plaintiff is an African American.

Jury Instructions (April 27, 1998) at 13.

The interrogatories asked the jury to answer a series of "yes" or "no" questions regarding

the USMS's liability, to determine the amount of compensatory damages, if any, owed to Fogg,

and to determine the probable pay level that Fogg would have achieved by the time of the jury's

determination.  The trial court designed the interrogatories to allow it to distinguish between

binding findings and those findings that would be advisory because they pertained to events prior

to the effectiveness of the Civil Rights Act of 1991, which amended Title VII.

With regard to the USMS's liability for specific actions alleged by Fogg, the

interrogatories asked the jury to determine whether the USMS had discriminated against him by "disparate treatment and/or retaliation" in the following instances: (a) "By his reprimand from Chief Hein in 1985 and his subsequent removal from the Welch/Columb Task Force and transfer to Superior Court?"; (b) "By the promotion of Deputy Slack rather than plaintiff to a GS-12 position in 1986?"; (c) "By the failure to take timely action on plaintiff's 1985 EEO complaint?"; (d) "By the failure to give plaintiff annual performance ratings for the two year period beginning in April 1990?"; (e) "By the promotion of Deputy Earp rather than plaintiff in May 1990?"; (f) "By the alleged failure to promote plaintiff to a GM-13 position while he was on the Metropolitain Area Task Force?"; (g) "By the failure to promote plaintiff to a GM-14 position while he was on the Metropolitain Area Task Force?"; (h) "By limiting plaintiff's supervisory duties on the Metropolitan Area Task Force in March 1992?"; (i) "By inquiring about plaintiff's Equal Employment Opportunity activities during his working hours in 1993?"; (j) "By ordering plaintiff back to work in September 1994?"; (k) "By returning plaintiff to the GM-12 level in December 1994?"; (l) "By ordering plaintiff to report for a fitness-for-duty examination in 1995?"; (m) "By dismissing plaintiff from the U.S. Marshals Service on grounds of insubordination in September 1995?" Jury Interrog. at ¶ 3.

The jury found that Fogg was subjected to and affected by a racially hostile working environment for the entire period at issue. Jury Interrog. at ¶¶ 1–2. The jury also found that the USMS had discriminated against Fogg in twelve of the thirteen instances listed in the interrogatories.[1] Jury Interrog. at ¶ 3. The jury's findings of discrimination included the USMS's

_____

[1] The only negative finding returned by the jury pertained to "the promotion of Deputy Slack rather than plaintiff to a GS-12 position in 1986." Jury Interrog. at ¶ 3(b).

order that Fogg report for a fitness-for-duty examination in 1995, as well as his dismissal on grounds of insubordination in September 1995.  In terms of compensatory damages, the jury found that Fogg should be awarded $4 million.  Jury Interrog. at ¶ 4.

After the trial, Defendant moved for judgment as a matter of law or a new trial, as well as remittur of the jury's $4 million award.  The trial court denied Defendant's motions for judgment as a matter of law or a new trial but remitted the jury's award to $300,000 in accordance with the 1991 Act's damage cap, 42 U.S.C. § 1981a(b)(3)(D).  Mem. & Order (July 1, 1999) at 7.

Fogg then moved for equitable relief.  The trial court granted back pay from the effective date of the 1991 Act through Fogg's dismissal, with several retroactive increases of pay and benefits from the Grade 12 level he held as of his dismissal through the Grade 14, Step 4 level. Order (Feb. 25, 2000).  Fogg's other requests for equitable relief were denied, however.  The trial court determined that he was not entitled to expungement of his dismissal from his employment records, reinstatement, front pay, or back pay beyond his dismissal date.

Regarding expungement, the trial court apparently did not consider itself  bound by the jury's finding that his dismissal was discriminatory.  See Tr. of Proceedings (Feb. 25, 2000) at 8. Instead, the trial court adhered to the MSPB's finding that the dismissal was valid.  The same rationale was applied to the requests for reinstatement and, alternatively, front-pay, as the trial court determined that Fogg was "validly dismissed from the Marshals Service for insubordination." Id. at 9.  The trial court elaborated as to its decision on reinstatement:

> it is my conclusion that Mr. Fogg did not want to return to the Marshals Service, notwithstanding his protestations for litigation purposes to the contrary.  And I do not credit the alleged disablement by reason of the discrimination that he at least was exposed to, whether it directly affected his own future or not.

Id. at 12.  The trial court took a negative view of Fogg's conduct when it summarized its

conclusion that Fogg was not entitled to further equitable relief:

> He has done no work for them.  He has refused to report for a fitness-for-duty
> examination.  And he has really gotten a pass from the day he was first told to go
> for a fitness examination until the date when he was finally dismissed for having
> failed to do so on several occasions.

Id. at 9.

 In reviewing the trial court's equitable relief decision, the court of appeals observed that

"[t]he jury found for Fogg on all the issues as to which its verdict is binding . . . [y]et the district

court appears explicitly to have rejected those findings in deciding that equitable relief was not

appropriate."  Fogg v. Ashcroft, 254 F.3d 103, 110 (D.C. Cir. 2001).  Citing the proposition that

"the right to a jury trial usually demands that the jury bind the court, rather than vice versa," the

court of appeals expressed its concern that, in determining that Fogg's dismissal was valid, the

trial court gave priority to the MSPB decision rather than the jury's verdict.  Id.  The court of

appeals was unable to discern the effect the trial court gave to the jury's findings, noting that the

trial court did not explain how its decision could be reconciled with the jury verdict.  Id.

Accordingly, the court of appeals "remand[ed] the equitable claims to the district court [to]

reconsider the matter consistent with the law of issue preclusion."  Id. at 111.  Although the

parties attempted to settle this matter through mediation before a magistrate judge, they were

unsuccessful.  Consequently, the court now considers Fogg's request for equitable relief in the

light of the remand.

**DISCUSSION**

"Title VII entitles individuals to be made whole for injuries suffered on account of unlawful employment discrimination." <u>Hayes v. Shalala</u>, 933 F. Supp. 21, 24 (D.D.C. 1996) (citations and quotations omitted).  Although a district court has "considerable discretion" in fashioning a remedy, <u>Lander v. Lujan</u>, 888 F.2d 153, 156 (D.C. Cir. 1989), it must "follow the jury's factual findings with respect to a plaintiff's legal claims when later ruling on claims for equitable relief." <u>Fogg v. Ashcroft</u>, 254 F.3d at 110 (quoting <u>Kolstad v. Am. Dental Ass'n</u>, 108 F.3d 1431, 1440 (D.C. Cir. 1997), <u>rev'd in part on other grounds</u>, 139 F.3d 958 (D.C. Cir. 1998), <u>vacated and remanded</u>, 527 U.S. 526 (1999)).  When a jury determines a defendant is liable for unlawful discrimination, a court may not deny a plaintiff's request for equitable relief based on its own opinion of the insufficiency of the evidence.  <u>See Kolstad</u>, 108 F.3d at 1440. Accordingly, the court now considers, first, the extent of the jury's factual findings of liability, and second, the appropriate equitable relief in light of those findings.

**I.      This is a Single Motive Case, Not a Mixed Motive Case**

First, it is necessary to determine the theory under which the jury found the USMS liable. A Title VII plaintiff may prove discrimination under a pretext theory (i.e., a "single motive" theory), or a "mixed motive" theory.  <u>Porter v. Natsios</u>, No. 04-5061, slip op. at 7–8 (D.C. Cir. July 1, 2005).  Proving discrimination under a pretext theory, 42 U.S.C. § 2000e-2(a)(1), requires the plaintiff to prove that the employer had only unlawful motives for his actions, with no lawful motive.[2]  <u>Porter</u>, slip op. at 7–8; <u>see also</u> <u>Gregg v. Hay-Adams Hotel</u>, 942 F. Supp. 1, 18 (D.D.C.

---

[2]  42 U.S.C. § 2000e-2 provides in pertinent part:

(a) Employer practices.  It shall be an unlawful employment practice for an employer–

1996) (characterizing the single motive burden of proof as a "but for" causation theory).  In

contrast, a mixed-motive theory, 42 U.S.C. § 2000e-2(m), requires a less demanding showing.  It

requires that the plaintiff prove only that unlawful discrimination played a substantial role in the

employer's decision, although legitimate factors may have also motivated the decision.[3]  Porter,

slip op. at 8–9.

The jury instructions do not indicate clearly the theory underlying the jury's liability

finding.  Fogg argues that Jury Instruction 30 charged the jury with a pretext analysis, citing the

following passage from that instruction:  "If the Defendant has shown that there were reasons,

other than race, for the challenged actions you must find for the Defendant, unless the plaintiff

proves that those reasons were false and that the real reason for the challenged actions was

plaintiff's race."  Jury Instructions (Apr. 28, 1998) at 13.  Defendant, however, identifies a

succeeding passage in Jury Instruction 30 that resembles a mixed motive instruction:  "plaintiff

need only prove that consideration of his race played a part in those actions, even though other

reasons may also have motivated those actions."  Id.  The Jury Interrogatories do not shed further

light on this issue, as they only asked that the jury determine whether the USMS "discriminated

---

(1) to fail or refuse to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such individual's race, color,
sex, or national origin;

[3]  42 U.S.C. § 2000e-2 provides in pertinent part:

(m) Impermissible consideration of race, color, religion, sex, or national origin in
employment practices.  Except as otherwise provided in this title . . . an unlawful
employment practice is established when the complaining party demonstrates that race,
color, religion, sex, or national origin was a motivating factor for any employment
practice, even though other factors also motivated the practice.

against plaintiff Matthew Fogg, by disparate treatment and/or retaliation" in each of thirteen instances listed.  Jury Interrogatories (Apr. 28, 1998) at 1.

The ambiguities surrounding the liability theory are resolved by turning to the post-trial proceedings before the trial court.  Throughout its post-trial motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), Defendant adhered to a pretext analysis in arguing that the jury's determinations were based on insufficient evidence.  For example, in impugning the jury's finding that Fogg's 1995 dismissal was motivated by discriminatory and/or retaliatory intent, Defendant argued that Fogg's case "falls far short of what is necessary to prove that the proffered reason for plaintiff's termination (insubordination) was a pretext for discrimination and retaliation."  Def.'s Mot. for J. as Matter of L. (May 12, 1998) at 21. Having sought to overturn the verdict on the basis of the more demanding pretext standard, Defendant may not now seek to limit the available remedies on the basis of the less demanding mixed motive standard.  Even if Defendant had not waived its ability to style the jury's finding as a mixed motive verdict, the trial court used only a pretext analysis in deciding Defendant's motion: "the jury obviously inferred from the evidence of the endemic atmosphere of racial disharmony and mistrust within the USMS that all explanations were suspect and that occult racism was more likely the reason than any other for Fogg's misadventures with the Marshals Service hierarchy." Mem. & Order (July 1, 1999) at 6.  Considering the parties and the trial court agreed previously that this case is a pretext case, the court will continue to treat it as such in accordance with the law of the case doctrine.  See LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996) ("the same issue presented a second time in the same case in the same court should lead to the same result").

10

These circumstances distinguish this case from Porter.  In Porter, the court of appeals concluded that a Title VII case was litigated on a mixed motive theory where the jury instructions referred to both the pretext and a mixed motive liability standards.  Porter, slip op. at 11–12.  In Porter, however, there is no indication that the district court decided the issue of liability according to a pretext standard.  See id.

Given that this is a single motive case and not a mixed motive case, the jury's findings as to disparate treatment and/or retaliation necessarily mean that it determined that race motivated the USMS's actions in twelve specific instances where it found liability.  With regard to the eight instances occurring at least in part after the effectiveness of the 1991 Act, the jury's verdict is binding.  Accordingly, the court must decide Fogg's request for equitable relief in a manner consistent with the jury's binding determinations, as the court of appeals emphasized.  See Fogg, 254 F.3d at 111.

As described above, the trial court denied several of Fogg's requests for relief—i.e., expungement, reinstatement, front pay, and back pay between September 30, 1995 and final judgment—on the ground that Fogg was validly dismissed for insubordination and thus undeserving of post-dismissal relief.  See Tr. of Proceedings (Feb. 25, 2000) at 9.  In the light of the jury's binding determination that Fogg was dismissed solely because of his race, the dismissal cannot be considered valid.  By the same token, the dismissal can no longer serve as a basis for denying equitable relief.  With these considerations in mind, the court considers Fogg's requests for relief.

II.    **Appropriate Equitable Relief**

Fogg requests the following forms of relief:

(a)    expungement of his records regarding his dismissal from the USMS on grounds of

insubordination;

(b)    back pay in the amount of approximately $881,000—reflecting retroactive

promotion through the Senior Executive Service Level, retroactive Thrift Savings

Plan contributions, and a 14 percent gross up to defray the adverse tax

consequences of the award—as well as compound annual interest at the rates

required by 5 U.S.C. § 5596, and restoration of his annual and sick leave accounts

as if he had been employed at the higher grade levels used in computation of back

pay; and

(c)    future relief in the form of reinstatement on active duty, or, alternatively,

reinstatement on administrative leave through retirement with benefits or an

equivalent amount of front pay.

As a preliminary matter, the requests for back pay and future relief raise the related issues

of whether Fogg's psychological problems prevent him from working as a law enforcement

officer and whether the USMS's discriminatory treatment caused those problems.  Although the

parties agreed at one point that Fogg's psychological problems made him unable to return to the

USMS, Fogg's most recent brief contemplates that, for purposes of reinstatement, he might be

cleared medically to return to the USMS.  Fogg has not submitted a workers' compensation

evaluation more recent than the one dating from 1996.  In the instant remand proceedings, he

does submit a report from a treating psychologist in Alabama, dated April 17, 2004.  See Pl's Br.

12

at Ex. C.  In the report, the psychologist diagnosed Fogg as suffering from "309.28  Chronic

Adjustment Disorder with Mixed Anxiety and Depressed Mood," and "R/O 296.30 Major

Depression (Recurrent)."  Id. at Ex.C, at 2.  It observes that Fogg has been totally disabled for

more than 10 years and should not be placed in the work force in any capacity.  Id.  While it may

be plausible that Fogg would recover from his psychological problems to the extent that he could

serve successfully as an active USMS employee, the court finds the possibility of such a scenario

so remote that it will treat the requests for equitable relief as if Fogg is permanently unable to

return to work at the USMS.

As for the cause of Fogg's condition, the parties disagree as to whether the USMS is to

blame.  At the post-trial equitable relief hearing, the trial court was unpersuaded that Fogg's

mental condition was attributable to the USMS's discriminatory conduct.  The April 2004

psychologist report linked Fogg's mental conditions to his ongoing legal disputes with the

USMS.  Id.  Although this report provides the most recent analysis of Fogg's psychological

problems, it does not refute the trial court's finding at the time of the trial that Fogg failed to

establish a causal connection between his injuries and the impermissible actions of the USMS.

Moreover, Defendant observes that Fogg has never reported to a treating psychologist other

sources of stress deriving from side businesses he ran while employed by the USMS, yet he

admitted at trial that he was indeed stressed by the deterioration of his finances that these side

businesses caused.  Considering this contradictory evidence, the court has no reason to abandon

the finding the trial court made after it heard all the evidence adduced at trial.

### A.    Expungement

Expungement of personnel records constitutes equitable relief under Title VII.  Smith v. Secretary of the Navy, 659 F.2d 1113, 1114 (D.C. Cir. 1981).  Fogg argues that his dismissal should be expunged from all federal records because the jury found that the dismissal was an act of discrimination on the grounds of race.  See Jury Interrog. No. 3(m).  Defendant argues that expungement should be precluded due to the mixed motive instruction given to the jury, however, as noted above, this is not a mixed motive case.  Currently, Fogg's federal employment records indicate he was dismissed for insubordination, which, as a matter of law, is false; he was dismissed either because he is African American or because he attempted to assert his right to equal employment.  To allow this situation to continue would be to diverge from the aim of Title VII equitable relief, i.e., to make the plaintiff whole.  Accordingly, Defendant must expunge the dismissal from Fogg's employment records.

### B.    Back Pay

Back pay is a form of equitable relief under Title VII, see 42 U.S.C. § 2000e-5(g)(1), and is not subject to the cap on compensatory damages.  See 42 U.S.C. § 1981a(b)(2).  "The back pay provision of Title VII 'is a manifestation of Congress' intent to make persons whole for injuries suffered through past discrimination' . . . ."  Berger v. Iron Workers Reinforced Rodmen, Local 201, 170 F.3d 1111, 1139 (D.C. Cir. 1999) (quoting Loeffler v. Frank, 486 U.S. 549, 558 (1988)).  A back pay award award should generally include prejudgment interest, id., and the value of lost fringe benefits.  Barbour v. Merrill, 48 F.3d 1270, 1278 (D.C. Cir. 1995).

Fogg asks that back pay be awarded for the period from November 21, 1991—the

effective date of the 1991 Act—to the present.[4]  Fogg's proposed dollar amount is the difference

between (1) the pay and benefits he would have received had he continued to work at the USMS

and received his desired promotions through the Senior Executive Service Level, and (2) his

actual income and benefits, including workers' compensation payments received during his time

on administrative leave.  The trial court originally analyzed back pay by drawing a distinction

between back pay before and after his dismissal on September 30, 1995.  The court will also

make this distinction in addressing Fogg's requests.

### 1.      From November 1991 to September 1995

The trial court's award of back pay for the period prior to Fogg's dismissal is consistent

with the jury's binding verdict.  The jury made binding determinations that the USMS

discriminated against him by (1) failing to promote him to a GM-13 position while he was on the

Metropolitan Area Task Force, Jury Interrog. at ¶ 3(f), (2) failing to promote him to a GM-14

position while he was on the task force,  Jury Interrog. at  ¶ 3(g), and by returning him to the

GM-12 level after his temporary assignment to the task force concluded in December 1994.  Jury

Interrog. at  ¶ 3(k).  Subsequently, the trial court ordered the following retroactive promotions

and increases in pay and benefits: (1) from the Grade 12 level to the Grade 13 level from

November 21, 1991, to July 27, 1992; (2) from the Grade 13 level to the Grade 14, Step 1 level

from July 28, 1992, to July 27, 1993; (3) from the Grade 14, Step 1 level to the Grade 14, Step 2

level from July 28, 1993, to July 27, 1994; (4) from the Grade 14, Step 2 level to the Grade 14,

Step 3 level from July 28, 1994, to July 27, 1995; and (5) from the Grade 14, Step 3 level to the

---

[4]  The 1991 Act entitles Title VII plaintiffs to a jury trial.  Consequently, when a jury determines an issue that arose after the effectiveness of the 1991 Act, that determination is binding upon a district court.

Grade 14, Step 4 level from July 28, 1995, to September 29, 1995.  Order (Feb. 25, 2000).  The

trial court also awarded up to 20 hours of overtime pay per pay period, pursuant to 5 U.S.C. §

5542, from November 21, 1991, to October 31, 1994, and Law Enforcement Availability Pay,

pursuant to 5 U.S.C. § 5545a, from on or about October 31, 1994, to September 29, 1995.

Considering its consistency with the jury's binding determinations, the original back pay award

will form a part of the total back pay award set forth below.

Defendant argues that no back pay should be awarded because the jury's findings are

purely speculative.  Defendant points out that Fogg's detail at the Metropolitain Area Task Force

was temporary—a term of three years, plus one extension through December 31, 1994—and that

any promotion conferred upon him would also have been temporary.  Defendant thus argues that

Fogg was properly demoted from the Grade 13 level back to the Grade 12 level at the end of his

task force appointment on December 31, 1994.  Furthermore, Defendant argues that Fogg, as a

Grade 12, was ineligible for a two-grade promotion to Grade 14 on the date the jury specified.

Alternatively, defendant asserts that the appropriate grade for calculating back pay is GS-13 as of

the day that Fogg's temporary detail at the task force ended.

Defendant's arguments are unpersuasive in light of the jury's binding verdict.  First, the

jury found that the USMS discriminated against Fogg by moving him from a GM-13 to a GM-12

level in December 1994.  See Jury Interrog. at ¶ 3(k).  Second, the jury specifically found that

Defendant's failure to promote Fogg to GM-13 and GM-14 positions while on the task force

were motivated by race.  See Jury Interrog. at ¶ ¶ 3(f), (g).  As Defendant acknowledges in its

brief, the regulations precluding a two-level promotion would not have precluded Fogg from

reaching the Grade 14 level while on the task force because Fogg became a Grade 13 on July 28,

16

1991, and thus would have been eligible for a Grade 14 promotion on July 28, 1992.

Furthermore, the binding effect of the jury's verdict negates Defendant's factual argument that it

legitimately returned Fogg to the GM-12 level after his appointment ended.

## 2.     Back Pay from September 1995 to the present

Although the trial court's original back pay award was consistent with the jury's verdict

with regard to the pre-dismissal period, the award is inconsistent with the verdict as it relates to

the post-dismissal period.  The jury found that the USMS discriminated against Fogg by ordering

him to report for a fitness-for-duty examination in 1995, Jury Interrog. 3(l), and by dismissing

him for insubordination in September of that year.  Jury Interrog. 3(m).  These binding

determinations preclude the possibility that Fogg's dismissal was valid, thereby negating Fogg's

supposed insubordination as a ground for denying relief.  In the light of the jury's binding

verdict, it is reasonable to infer that, absent the USMS's impermissible actions, Fogg would have

continued to be an employee of the USMS.

Defendant argues that Fogg is not entitled to back pay for the period following his

termination because (1) he is currently receiving workers compensation and (2) he failed to use

reasonable diligence to find other suitable employment.

First, Defendant argues that, because Fogg is receiving worker's compensation benefits

pursuant to the Federal Employee Compensation Act, 5 U.S.C. § 8116(a) ("FECA"), the statute

bars him from receiving back pay during the period in which he has received FECA benefits.

Fogg filed a FECA claim in 1993 on the basis of a stress condition created by an accumulation of

unsettled employer-related discriminatory events.  He has received non-taxable workers'

compensation for Adjustment Disorder with Anxious Mood since at least 1995 at the rate of

66.67% of his monthly basic salary at the time of his alleged injury.  For one who receives

benefits as a result of an "injury" as defined by the statute, FECA bars that person from receiving

"salary, pay, or remuneration of any type from the United States, except . . . in return for service

actually performed."  Id.  Because harm as a result of Title VII discrimination is not an "injury"

within the meaning of FECA, it does not bar the court from awarding equitable relief.  See

Nichols v. Frank, 42 F.3d 503, 515 (9th Cir. 1994) (finding that harm suffered from sex

discrimination is not an "injury" within the meaning of FECA).  The court need not decide

whether Fogg is entitled to FECA benefits.

Second, Defendant argues that Fogg failed to use reasonable diligence to find other

suitable employment.  A Title VII claimant has a statutory duty to mitigate damages.  Ford Motor

Co. v. EEOC, 458 U.S. 219, 232 (1982).  Although a claimant forfeits his right to back pay if he

refuses a job "substantially equivalent" to the one he was denied, he need not go into another line

of work.  Berger v. Iron Workers Reinforced Rodmen, Local 201, 170 F.3d 1111, 1133 (D.C.

Cir. 1999) (quoting Ford Motor Co., 458 U.S. at 231).  A clamant is only required to make

"reasonable efforts" to mitigate his loss of income, and only "unjustified refusals" to find other

employment are penalized.  Berger, 170 F.3d at 1133 (quoting Oil, Chem. & Atomic Workers

Int'l Union v. NLRB, 547 F.2d 598, 603 (D.C. Cir. 1976)).  Furthermore, "[t]he burden of

establishing facts in mitigation of the back pay liability" is upon the violator.  Id. (quoting  NLRB

v. Madison Courier, Inc., 472 F.2d 1307, 1321 (D.C. Cir. 1972)).

Fogg's response is two-fold.  First, Fogg responds that he has been disabled as a result of

discrimination he suffered at the hands of the USMS since his dismissal and unable to be

employed in any capacity.  This argument relies on an uncertain premise; the jury's binding

verdict does not address whether USMS discrimination caused Fogg's alleged disability, and the trial court was not persuaded that such a causal connection existed. Fogg's second contention is persuasive, however. Fogg contends that, for the time period during which he is accused of failure to mitigate, any efforts to find a comparable law enforcement position would have been futile in light of the fact that his record showed he had been dismissed from the USMS for insubordination. Even if, as Defendant asserts, Fogg proved his capacity to work by engaging in public speeches and other activities as part of a campaign against discrimination in law enforcement, Defendant does not explain how Fogg could have found substantially equivalent alternative employment with a record that reflects his dismissal for insubordination. Accordingly, the court declines to penalize Fogg for a failure to mitigate.

### 3. Back Pay Award

Based on the foregoing considerations, Fogg is entitled to back pay for the periods before and after his dismissal. For the pre-dismissal period from November 21, 1991, to September 29, 1995, Fogg is entitled to back pay according to trial court's original order, see Order (Feb. 25, 2000), less the pay and benefits Fogg actually received. For the post-dismissal period from September 30, 1995, through the date of this order, Fogg is entitled to back pay in the form of retroactive increases of pay and benefits, calculated as if Fogg had been at the Grade 14, Step 4 level for two months as of September 30, 1995, and reflecting any automatic step increases to which he would have been entitled had he served within Grade 14 through the present. The post-dismissal back pay amount shall be reduced by the amount of workers' compensation benefits

Fogg received.[5]

Consistent with the trial court's original order, Fogg shall receive 20 hours of overtime per pay period pursuant to 5 U.S.C. § 5542, from November 21, 1991, to October 31, 1994, the approximate date at which Law Enforcement Availability Pay became available pursuant to 5 U.S.C. § 5545a. For the period from November 1, 1994, through the date of this order, Law Enforcement Availability Pay shall be awarded instead of overtime, as the former is a less speculative measure of the pay that Fogg would have received in excess of his salary.

Fogg requests that any back pay award be grossed up by 14 percent to reflect the adverse tax consequences of a lump sum award. Similarly, Fogg acknowledges that the amount of workers' compensation payments deducted from the award should be increased by 30 percent to reflect the tax free nature of those payments. Defendant does not address this issue. Considering that inclusion of a tax component in a back pay award may be appropriate where, as here, the litigation is protracted, see Sears v. The Atchison, Topeka & Santa Fe Ry. Co., 749 F.2d 1451, 1456 (10th Cir. 1984), the court finds it appropriate to adjust both the back pay award and the deduction for workers' compensation payments received, in accordance with Fogg's request.

The aggregate back pay award shall be payable with interest, calculated according to the formula set forth in 5 U.S.C. § 5596(b)(2) and 26 U.S.C. § 6621(a)(1).

---

[5] Fogg's request goes beyond the Grade 14 level; he requests a retroactive promotion to the Grade 15 level as of 1998 and promotion to the Senior Executive Service ("SES") no later than May 1, 2001. The jury was asked to make an advisory finding as to the level Fogg would have reached as of April 1998 absent a discriminatory environment, and it chose the GS-15 level rather than the SES or GS-14 levels. See Jury Interrog. at ¶ 5. Despite the jury's advisory finding, the court finds a merit-based promotion to the Grade 15 level or beyond to be overly speculative. Although Fogg presented evidence to suggest that he performed the duties of a Grade 14 marshal while on the Metropolitain Area Task Force, the court is not persuaded that he would have been among the relatively few marshals selected to advance to the Grade 15 level.

Fogg's request for retroactive Thrift Savings Plan contributions is denied as overly speculative; the court refuses to guess that Fogg would have contributed to the plan had he been eligible.

### C.    Future Equitable Relief

#### 1.    Reinstatement

In his first post-remand request for equitable relief, Fogg requested reinstatement with placement on paid administrative leave, arguing that such a remedy was appropriate in light of the severe psychological damage he suffered as a result of the USMS's discriminatory actions. Fogg has amended this request, stating that he "is willing to return to the Marshals Service, assuming he is able to pass a medical and psychological examination and there is no longer a hostile environment."  Pl.'s Br. at 27.

Defendant makes four arguments against reinstatement: (1) that 42 U.S.C. § 2000e-5(g)(2)(B), bars reinstatement when liability is proven under a mixed-motive instruction; (2) Fogg is incapable of returning to work, making reinstatement unlawful and inappropriate under Newhouse v. McCormick & Co., Inc., 110 F.3d 635, 641 (8th Cir 1997); (3) animosity between Fogg and the Defendant makes reinstatement inappropriate, see Webb v. District of Columbia, 146 F.3d 964, 976 (D.C. Cir. 1998); (4) under the after-acquired evidence rule, future relief is inappropriate where Fogg has engaged in post-termination misconduct that would have precipitated his dismissal, i.e., falsely identifying himself as a currently employed Deputy Marshal to Congress and others, as well as unauthorized use of the USMS badge on his website.[6]

---

[6]  Fogg testified before the Congressional Black Caucus on May 10, 1999.  Fogg's supplemental statement from that hearing identifies him as "Chief Deputy U.S. Marshal Matthew Fogg."  Def.'s Op. Br. (Sept. 29, 1999) at Ex. 2.  A page from Fogg's website, dated September

Defendant's third point leads the court not to order any form of reinstatement. Considering the many years of administrative disputes and litigation between the parties and their inability to settle this case, the court finds it inappropriate to return Fogg to work at the USMS. See id. Moreover, as stated above, the court finds it highly unlikely that Fogg would be able to return to active duty, and it credits Fogg's admissions to that effect. The animosity between the parties also leads the court not to reinstate Fogg on administrative leave. Even if such a remedy were compatible with the laws, regulations, and policies pertaining to USMS employees, it is likely to create further conflict by prolonging the parties' troubled relationship into the indefinite future.

### 2.      Front Pay

Alternatively, Fogg requests a front pay award based on continued employment at the senior executive service level through retirement and a life expectancy of at least 83 years. In support of his position, Fogg cites Pollard v. E. I. du Pont de Nemours & Co., 532 U.S. 843 (2001), which states that a court may award front pay when a plaintiff is unable to work due to "psychological injuries suffered by the plaintiff as a result of the discrimination . . . ." Id. at 846.

"[T]he purpose of front pay is to make a victim of discrimination whole and to restore him or her to the economic position he or she would have occupied but for the unlawful conduct of his or her employer." Barbour v. Merrill, 48 F.3d 1270, 1279 (D.C Cir. 1995) (quoting Green v. USX, 843 F.2d 1511, 1531 (3d. Cir. 1988)) (internal quotation marks and punctuation omitted). "[A] district court should not refuse to award front pay merely because some

---

14, 1999, identified him as a "U.S. Marshal." Id., Ex. 3 at 2. Fogg denies "that he has unlawfully held himself out as a Deputy U.S. Marshal since his termination." Pl.'s Br. at 29.

speculation about future earnings is necessary . . . ." <u>Id.</u> at 1280.

Defendant opposes front pay, citing Fogg's apparent inability to work as well as his misrepresentations of himself as a U.S. Marshal.  Under EEOC administrative precedent, front pay is not appropriate for an individual who is unable to return to work and is receiving workers compensation benefits.  <u>See, e.g.</u>, <u>Baxter v. Henderson</u>, EEOC Appeal No. 01983981, 2000 WL 1090306 (July 17, 2000); <u>Brinkley v. Henderson</u>, EEOC Appeal No. 01953977, 1999 WL 683708 (August 12, 1999).  EEOC administrative decisions are accorded deference.  <u>See Fitgerald v. Secretary, United States Dep't of Veteran Affairs</u>, 121 F.3d 203, 207 (5th Cir. 1997).

Fogg responds with two arguments.  First, Fogg claims that he is willing to return to work "assuming he is able to pass a medical and psychological examination and there is no longer a hostile work environment."  Pl.'s Br. at 27.  This rationale has already been discounted.

Second, Fogg argues that the EEOC decisions are a departure from the law and should not be followed.  Indeed, in <u>Pollard</u> the Supreme Court explained that:

> We see no logical difference between front pay awards made when there eventually is reinstatement and those made when there is not.  Moreover, to distinguish between the two cases would lead to the strange result that employees could receive front pay when reinstatement eventually is available but not when reinstatement is not an option -- whether because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries that the discrimination has caused the plaintiff.  Thus, the most egregious offenders could be subject to the least sanctions . . . . as written, the text of the statute does not lend itself to such a distinction, and we will not create one.

532 U.S. 843, 853 (2001).

Here, the court finds an award of front pay inappropriate.  As noted above, Fogg failed at trial to establish that the USMS's impermissible actions caused the mental conditions that prevent him from working as a law enforcement officer.  Fogg's inability to make this showing

has not prevented him from being made whole, however.  The large amount of Fogg's back pay

award provides him with sufficient equitable relief from the USMS's impermissible actions:  the

award includes 10 years of post-dismissal back pay, a period more than half as long as his 17

years of actual employment with the USMS.[7]

The court also finds it appropriate to deny front pay under the equitable doctrine of

unclean hands, which "closes the doors of a court of equity to one tainted with inequitableness or

bad faith relative to the matter in which he seeks relief, however improper may have been the

behavior of the defendant."  Precision Instrument Mfg. Co. v. Automotive Maintenance

Machinery Co., 324 U.S. 806, 814 (1945); see also United States v. Philip Morris USA, Inc., 396

F.3d 1190, 1222 (D.C. Cir. 2005) (observing that a district court's discretion to award equitable

relief must operate "within the bounds of equitable doctrines, recognizing defenses like laches

and unclean hands").

The court finds that, during the pendency of this litigation, Fogg misrepresented himself

as "Chief Deputy U.S. Marshal Matthew Fogg" in various fora, most notably during testimony

before the Congressional Black Caucus on May 10, 1999.  See Def.'s Op. Br. (Sept. 29, 1999),

Ex. 2 (providing supplemental statement and hearing transcript).  He also identified himself as a

"U.S. Marshal" on his web page as of September 14, 1999.  Id., Ex. 3 at 2.  This conduct may

amount to a felony criminal offense.  See 18 U.S.C. § 912 (providing for a fine or imprisonment

---

[7]  Even if Fogg were to receive some front pay, it would be significantly less than his
back pay award.  Fogg will reach mandatory retirement age in four years.  At the time of his
dismissal, Fogg was 43 years-old and had been employed at the USMS for 17 years.  He is now
53 years-old and would be eligible for retirement at 56.  Retirement at age 57 is mandatory for a
federal law enforcement officer with 20 years of service.  See 5 U.S.C. § 8335(b).  Because front
pay is not intended to be a permanent remedy, four years of front pay at the GS-14 level is all that
Fogg could reasonably seek.

of up to three years for one who "falsely assumes or pretends to be an officer or employee acting

under authority of the United States . . . and acts as such").  Because Fogg's misconduct is

wholly inconsistent with the duties of a federal law enforcement officer, the court finds it

inappropriate to provide prospective relief as if he would be a U.S. Marshal in good standing.[8]

## CONCLUSION

Based on the foregoing, Plaintiff's motion for equitable relief is GRANTED in part and

DENIED in part.  Judgment in accordance with this opinion shall enter separately.


SO ORDERED.


    /s/  Jane A. Restani
                                                    Jane A. Restani
                                                         Judge

Dated: July 25, 2005

---

[8] Defendant argues that Fogg's misconduct should be addressed under the after-acquired evidence rule.  This rule generally applies to situations in which the plaintiff's misconduct occurred before dismissal and would have resulted in the plaintiff's termination if the employer had known of the misconduct.  See McKennon v. Nashville Banner Publ. Co., 513 U.S. 352, 362–63 (1995).  The instant misconduct occurred after dismissal.  In describing the rule's contours, however, the Supreme Court has suggested that a district court may apply the rule in situations beyond the standard after-acquired evidence case:  "In determining the appropriate order for relief, the court can consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party."  Id. at 362.